IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE ODYSSEY HEALTHCARE, INC.　§
　　　　　　　　　　　　　　　　　§　　　　Civil Action No. 3:04-CV-0844-N
SECURITIES LITIGATION　　　　　　§

## ORDER

Before the Court are Defendant Odyssey Healthcare, Inc. ("Odyssey") and Defendants Burnham, Gasmire, and Cannon's (collectively, the "Individual Defendants") Motion to Dismiss filed on February 15, 2005, and Lead Plaintiffs' Motion to Strike, filed on April 12, 2005. Because Lead Plaintiffs' Consolidated Complaint (the "Complaint") fails to state a claim in compliance with the Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the  Court grants the Motion to Dismiss. Additionally, because the Court reaches this result without reference to the exhibits Lead Plaintiffs seek to strike, the Motion to Strike is moot.

## I. FACTUAL BACKGROUND

Lead Plaintiffs represent a putative class that purchased Odyssey stock on or between May 5, 2003 and October 18, 2004 ("Class Period").  Odyssey Healthcare operates Medicare-certified hospices in 20 states for terminally-ill patients and their families.  Formed in 1996 as a single hospice, Odyssey embarked on a strategy of growth that resulted in it running over fifty hospices at the time of the complaint.  Named defendants are Odyssey Healthcare and its top managers for the Class Period: Richard R. Burnham, Chairman and CEO (the latter until January 1, 2004) of Odyssey; David C. Gasmire, President, CEO (from

January 1, 2004 until October 15, 2004), and Director of Odyssey; Douglas B. Cannon, Senior Vice President, CFO, Assistant Secretary, and Treasurer of Odyssey.

On October 18, 2004, Odyssey announced: (1) a reduction of earning per share estimates; (2) Gasmire stepping down as President and CEO of Odyssey; and (3) a Department of Justice ("DOJ") civil investigation related to Medicare fraud. Odyssey's stock price subsequently declined nearly fifty percent on extraordinarily heavy trading volume, and analysts generally lowered ratings of the stock from buy to hold. Lead Plaintiffs claim they lost "tens of millions of dollars" as a result. They attribute their losses to fraud on the part of Odyssey and the three named defendants.

Lead Plaintiffs assert Defendants caused their loss through various statements and omissions that were false and misleading during the Class Period and that artificially inflated Odyssey's stock price, all in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. §§ 78j(b) & 78t(a) (1997), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). Lead Plaintiffs allege Defendants: (1) violated federal Medicare and Medicaid law by admitting patients with longer than six months to live for Hospice care; (2) failed to timely discharge patients that no longer qualified for hospice care; (3) reported nonexistent revenues through double billing, billing for services not rendered and recognizing revenue that exceeded Medicare caps for reimbursement; and (4) misstated the expansion program's success, which allegedly was mired in difficulties.

On February 15, 2005, Defendants moved to dismiss Lead Plaintiffs' complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), for failure to plead

fraud with particularity as required by Federal Rule of Civil Procedure 9(b), and for failure to plead scienter adequately pursuant to the Private Securities Litigation Reform Act, ("PSLRA"), 15 U.S.C. § 78u-4 (1995). In addition, Defendants argue that because Lead Plaintiffs failed to plead a Rule 10b-5 violation, their section 20(a) allegations must also fail. Because this Court agrees that the complaint fails to state a claim upon which relief can be granted, the case is DISMISSED.

## II. PLEADING UNDER THE PSLRA AND RULE 9(B)

In order to survive the present motion to dismiss, Lead Plaintiffs' complaint must state a claim sufficient to survive scrutiny under Fed. R. Civ. P. 12(b)(6) and state the circumstances of fraud with particularity in compliance with Fed. R. Civ. P. 9(b) and the PSLRA. Additionally, it must comply with the further requirements of the PSLRA by alleging both the materiality of the misstatements and also the facts giving rise to a strong inference of scienter.

A complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41 (1957). Courts must accept a plaintiff's factual allegations as true. *Kaiser Aluminum & Cem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). However, to avoid dismissal, the plaintiff "must come forward with specific supporting factual allegations, not mere conclusory allegations or mischaracterizations of defendants' actual statements." *Alcina v. Pcorder.Com, Inc.*, 230 F. Supp. 2d 732, 736 (W.D. Tex. 2002).

Because Lead Plaintiffs assert fraud claims under the Exchange Act Rule 10(b), they must also satisfy heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the PSLRA to avoid dismissal. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002). Rule 9(b) requires certain minimum allegations to be pled in securities fraud cases including the specific place, time, and content of the false representations as well as the identity of the individual making the false representations and what the person gained from making the representations. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993). Additionally, the PSLRA requires complaints in security fraud cases "to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §§ 78u-4(b)(1) (1995). For particularity purposes, a plaintiff must specify the who, what, when, where, and how of their alleged securities fraud. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002).

Plaintiffs set out their factual allegations in a manner that creates difficulty in assessing whether the alleged fraudulent statements or omissions meet the pleading requirements under Rule 9(b) and the PSLRA. The chronologically-organized Complaint quotes long passages of Defendants' public statements without identifying which portion of the statement is false. After each brief series of alleged misrepresentations the complaint

repeats substantially the same formulaic explanation why the statement is a misrepresentation:

> The statements in ¶¶ 44-47 were false and misleading when made. At the time these statements were made defendants actually knew that Odyssey's expansion program was not succeeding and could not be sustained because the Company's expansion activity had overwhelmed Odyssey's infrastructure and resources and, as a result, the Company was experiencing serious problems integrating newly acquired hospice centers, as detailed above. In addition, defendants knew that Odyssey was violating federal Medicare and Medicaid laws by admitting patients who did not qualify for hospice care, billing the government for services rendered to hospice patients that were not actually provided, and failing to timely discard patients who no longer qualified for hospice treatment under federal Medicare laws and guidelines, all for the purpose of artificially inflating the Company's public reported revenues, net income and earnings. Moreover, defendants continued to conceal the fact that the Company was continuing to submit false claims to the United States for payment under Medicare and that its patient admissions, patient retention and billing practices violated applicable federal laws

Complaint ¶ 49; *see id.* ¶¶ 58, 62, 67, 75, 78, 87, 90, & 96. Thus, the substance of the Complaint seems to be primarily that otherwise truthful statements were misleading due to omissions.

### III. LOSS CAUSATION

In *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005), the Supreme Court addressed the loss causation element of a securities fraud cause of action. Loss causation is "a causal connection between the material misrepresentation and the loss." *Id.* at 1631. Because the requirement of loss causation limits the allegations this Court must otherwise address, it will consider loss causation first in the analysis, though it is usually listed as the last element of the claim. *E.g.*, *id.*

ORDER – PAGE 5

The Complaint alleges that on October 18, 2004, Odyssey "shocked the market by announcing": (1) its 2004 earnings per share would be $0.94-$0.96, rather than the previously predicted $1.03-$1.05; (2) Gasmire was resigning as president and CEO "in light of the operational challenges we have experienced"; and (3) the DOJ has begun an investigation of the company under the False Claims Act.  Complaint ¶ 97.  Stock analysts then issued negative reports on Odyssey on October 18-19, 2004.  *Id.* ¶ 98.  "On this news, Odyssey's stock price collapsed . . . ."  *Id.* ¶ 99.  Finally, the Complaint alleges that "[a]s a result of defendants' misconduct, Lead Plaintiffs and the Class suffered tens of millions of dollars in damages."  *Id.* ¶ 100.

In *Dura*, the Supreme Court considered the Ninth Circuit's view that a plaintiff need only show that the stock price on the date of purchase was inflated due to the misrepresentation.  *Dura*, 125 S. Ct. at 1631.  After determining that the Ninth Circuit had misstated the plaintiff's burden of proof at trial, the Court then turned to pleading requirements: "Our holding about plaintiffs' need to *prove* proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to *allege* these requirements."  *Id.* at 1634 (emphasis in original).  After noting the minimal requirements of Rule 8(a)(2), the Court observed:

> But, even so, the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests. The complaint before us fails this simple test.
>
> As we have pointed out, the plaintiffs' length complaint contains only one statement that we can fairly read as describing the loss caused by the defendants' "spray device" misrepresentations.  That statement says that the plaintiffs "paid artificially inflated prices for Dura's securities" and suffered

"damage[s]." The statement implies that the plaintiffs' loss consisted of the "artificially inflated" purchase "prices." The complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient. The complaint contains nothing that suggests otherwise.

For reasons set forth in Part II-A, *supra*, however, the "artificially inflated purchase price" is not itself a relevant economic loss. And the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's "spray device."

We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.

*Id.* (citations omitted). Neither the Fifth Circuit nor any district court within the Circuit has yet had occasion to address *Dura*. The only circuit yet to speak on *Dura* is the Sixth Circuit in an unpublished opinion. *D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994 (6th Cir. 2005).

The parties disagree regarding the scope of what *Dura* now requires a plaintiff to plead. It is sufficient for the moment for the Court to note that all Lead Plaintiffs pled here regarding loss causation are the claims quoted above: Odyssey disclosed (a) the revised earnings projections, (b) Gasmire's resignation, and (c) the DOJ investigation; analysts lowered their assessment of Odyssey stock; and the stock price then fell. Because the Complaint makes no other allegations regarding loss causation, the Court can confine its analysis to those three items disclosed. All claims in the Complaint other than these three items are dismissed for failure to allege loss causation.

ORDER – PAGE 7

## IV. REVISED EARNINGS PER SHARE FORECAST

The PSLRA provides a "safe harbor" from liability for a forward looking statement when it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially."  15 U.S.C. § 78u-5(c)(1).  The statements of which Lead Plaintiffs complain regarding projected 2004 earning per share are the earnings new release, *see* Complaint ¶ 71, and Gasmire's statements at the Lehman Brothers conference.  *See* Complaint ¶ 76.  Both of those statements qualify for the safe harbor.

First, both statements are clearly forward looking, and identified as such.  Second, both were accompanied by meaningful cautionary statements.  The earning press release itself included meaningful cautionary statements.[1]  Likewise, Odyssey's press release

---

[1]*See* App. 154-55:

*Certain statements contained in this press release are forward-looking statements within the meaning of the federal securities laws.  Such forward-looking statements are based on current management expectations and are subject to known and unknown risks, uncertainties and assumptions which may cause the forward-looking events and circumstances discussed in this press release to differ materially from those anticipated or implied by the forward-looking statements.  Such risks, uncertainties and assumptions include, but are not limited to, general market conditions, inflation, Medicare cap limits, patient census growth, challenges inherent in and potential changes in the company's growth and expansion strategy, the ability to attract and retain healthcare professionals, the company's dependence on patient referral sources, changes in reimbursement levels under the Medicare and Medicaid programs, and the disclosures contained under the headings "Overview of Government Payments" and "Some Risks Related to Out Business" in "Item 1. Business" of Odyssey's Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 27, 2003, and in Odyssey's most recent report on Form 10-Q and its other filings with the Securities and Exchange Commission.  Many of these factors are beyond the ability of the company to control or predict.  Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements, which reflect management's view only as of the date hereof.  The company undertakes no*

regarding the Lehman Brothers conference included meaningful cautionary statements.[2] Moreover, both statements included reference to the disclosure of risks in Odyssey's SEC filings. These cautionary statements are not just generic warnings, but cite industry-specific dangers, such as Medicare cap limits, patient census growth challenges inherent in the company's growth strategy, and changes in Medicare and Medicaid reimbursement strategy. The Court finds that these were adequate cautionary statements. *See In re Michaels Stores, Inc. Sec. Litig.*, 2004 WL 2851782, at *6-7 (N.D. Tex. Dec. 10, 2004) (court can assess adequacy of cautionary statements in motion to dismiss). Moreover, while the Complaint does allege that "defendants" generally knew of the alleged falsity of some of the claimed misrepresentations elsewhere in the Complaint, the Complaint does not allege that Defendants knew the 2004 projections were false when made.

Lead Plaintiffs also cite statements by securities analysts in the wake of Odyssey's release of 2004 earnings per share projections. *See* Complaint ¶¶ 72-74, 76. With regard to the earnings per share projections, these allegations essentially state merely that the analysts repeated Odyssey's projections. They do not specify "how the defendant was entangled with or manipulated the information and the analyst." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373 (5th Cir. 2004). Lead Plaintiffs claim they do not need to

---

*obligation to revise or update any of the forward-looking statements or publicly announce any updates or r4evisions to any of the forward-looking statements contained herein to reflect any change in the company's expectations with regard thereto or any change in events, conditions, circumstances or assumptions underlying such statements.* (emphasis in original)

[2]*See* App. 160 (substantially identical to statement in note 1, *supra*).

plead entanglement because they seek to hold Odyssey liable for the statements made directly to the analysts. *See* Response at 22. Taking this as a "conduit" theory, in the Fifth Circuit "to satisfy the pleading requirements on such a 'conduit' theory, a complaint must specify . . . how the defendant was entangled with or manipulated the information and the analyst." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005). Moreover, to adopt Lead Plaintiffs' theory would be to engraft a securities analyst exception to the safe harbor, which the Court declines to do. Accordingly, the Court dismisses the portion of the Complaint dealing with 2004 earnings per share projections.[3]

### V. GASMIRE'S RESIGNATION

The next area in which the Complaint alleges loss causation is in connection with Gasmire's resignation. Defendants argue that this could be a corrective disclosure only if Odyssey had represented that Gasmire would be president and CEO forever; because that representation was never made, the October 18, 2004 disclosure of Gasmire's resignation does not establish any actionable loss causation. This is a bit too facile treatment of the disclosure. The Complaint alleges:

> The Company also announced that Gasmire had "decided to leave the company" and that Burnham, Odyssey's Chairman, will resume the "additional

---

[3]The Court notes there is some authority suggesting that the safe harbor does not apply to forward looking statements that are misleading due to an omission of historical fact. *See In re Complete Mgt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). With respect, the PSLRA safe harbor does not distinguish between statements that are misleading because of falsity and statements that are misleading because of omissions of historical fact. The Court declines to judicially graft such an exception onto the statutory safe harbor.

duties of president and chief executive officer" of the Company "effective immediately."

> "We greatly appreciate and respect David's contributions to the company over the past eight years, including the past nine months as president and CEO," said Mr. Burnham. "However, in light of the operational challenges we have experienced, all parties agreed that it was best to take quick action to put us back on a steady track."

Complaint ¶ 97. Fairly read, this appears to allege that Gasmire resigned in connection with "operational challenges." Liberally construed, this could be taken as some form of a corrective disclosure regarding prior statements that Odyssey's operations were proceeding smoothly.[4]

This acknowledgment of operational challenges is at a very high level of generality. It lacks the requisite specificity to be taken as corrective of any more specific alleged misstatements. This follows from *Dura*'s requirement that the complaint provide the defendants with notice of what the causal connection might be between the loss and the misrepresentation. *Dura*, 125 S. Ct. at 1634. When the causal argument is, as here, that disclosure of information puts the market on notice of the falsity of prior representations, then the disclosure must at minimum be of a nature that would cause recipients to identify which representations were the false prior representations. In other words, loss causation

---

[4]The parties disagree regarding what character of disclosure is required to establish loss causation after *Dura*. Defendants argue the corrective disclosure must "reveal to the market the falsity of the prior" statement. *Lentell v. Merrill Lyncy & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (pre-*Dura*). *See also D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994, 1000 (6th Cir. 2005) (unpublished; post-*Dura*). The Court need not decide how far the disclosure must go. In order for there to be a causal connection as required by *Dura*, however, the disclosure at minimum must identify which prior representation is called into question.

ORDER – PAGE 11

would not be established if a defendant simply said "something we told you last year isn't true," because that is insufficient to show that stock prices were inflated due to a specific misrepresentation and the market reacted when the misrepresentation became known.

Here the disclosure of "operational challenges" is not sufficient to place the market on notice of any misrepresentation of any specific facts.  At most, it might place the market on notice of a misrepresentation that there were no operational challenges.  The Complaint makes that type of general claims of misrepresentations.  *See, e.g.*, Complaint ¶¶ 44 ("Our goal of providing excellent service to an increasing number of patients and their families and leveraging our existing infrastructure to produce strong financial performance is showing very good results"); ¶ 53 ("We are very pleased with our continued strong financial performance"); ¶ 63 ("We are very please to report strong growth in revenue and net income . . . ." and "We have also made excellent progress in expanding into new communities and increasing the number of patients in our existing programs."); ¶ 71 ("we have made good progress in expanding into new communities through start-ups and strategic acquisitions"). Such generalized claims, however, are immaterial puffing.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869-70 (5th Cir. 2003) ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial.").  Thus, to the extent the Complaint alleges a loss causation from a corrective disclosure regarding Gasmire's departure due to "operational challenges," the Court grants the motion to dismiss because the predicate misrepresentations are inactionable, immaterial puffing.

## VI. THE DOJ INVESTIGATION

Finally, the Complaint alleges loss causation due to the disclosure of the DOJ investigation. That disclosure stated:

> In an unrelated announcement, the company said the Civil Division of the U.S. Department of Justice (DOJ) informed the company in September that it had begun an investigation of the company under the False Claims Act. In its notification to the company, the DOJ said the investigation relates to the company's claims for payment submitted to the United States dating from Jan. 1, 2000, to the present, and covers the company's conduct with respect to patient admissions, patient retention and billing practices.

Complaint ¶ 97. The Complaint alleges misstatements regarding compliance with Medicare and Medicaid requirements in two ways. First, the Complaint alleges an affirmative misstatement of compliance with applicable Medicare and Medicaid laws, rules and regulations in Odyssey's 2003 10-K. *See* Complaint ¶ 20. Second, the Complaint alleges a misleading omission of noncompliance with Medicare and Medicaid requirements in connection with each of the alleged misstatements. *See* Complaint ¶¶ 49, 58, 62, 67, 75, 78, 87, 90, 96. The Court will address those two species of misstatements in turn.

### A. The Complaint Fails to Allege Scienter Adequately for the 2003 10-K

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), the Supreme Court defined scienter for purposes of securities fraud cases as "a mental state embracing intent to deceive, manipulate, or defraud," but did not decide whether it included recklessness. In *Broad v. Rockwell*, 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc), the Fifth Circuit

determined that recklessness would not meet the scienter requirement, but that "severe recklessness" would. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 961-62. The PSLRA did not alter the substantive requirements of scienter, but changed the procedure for pleading that element. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408-09 (5th Cir. 2001). "Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (citing *Nathenson*, 267 F. 3d at 410-12). "Also, the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information." *Id.* at 432 (citing *Fine v. American Solar King Corp.*, 919 F.2d 290 (5th Cir. 1990)).

The Complaint does not state with particularity facts giving rise to a strong inference of scienter with respect to Medicare and Medicaid irregularities in connection with the 2003 10-K. The Court will first consider the allegations relating to the Individual Defendants. The Complaint generally alleges that irregularities were reported to unnamed "senior management," but does not allege that irregularities were reported to the Individual

Defendants. *See* Complaint ¶¶ 39, 42. Rather, the Complaint alleges that Individual Defendants' knowledge of Medicare and Medicaid irregularities "is in little doubt" because of Odyssey's internal audit and monitoring programs. *Id.* ¶¶ 36, 37. The Complaint does not allege the existence of any specific reports that would have disclosed such irregularities that were provided to the Individual Defendants.[5] Essentially, the Complaint requires stacking an inference upon an inference: first, that Odyssey's internal auditing and monitoring procedures would have detected the irregularities, and second, that due to their position in the company, the Individual Defendants would have known of the results of such audit.

Fifth Circuit and Northern District of Texas case law clearly forecloses this kind of "positional scienter." "A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams*, 292 F.3d at 424 (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)). *See also R2 Investments, LDC v. Phillips*, 401 F.3d 638, 646 (5th Cir. 2005) ("We will not, however, attribute knowledge of the document's contents based solely on the positions of the defendants."); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 252 (5th Cir. 2003) ("We agree with the district court that the PSLRA standards, as interpreted by this court, do not entitle the plaintiffs to make a conclusory assumption that simply because a monthly report was generated and distributed to an individual who reported to [the chief

---

[5]"The plaintiffs' allegations regarding non-specific internal reports are also inadequate. An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *Abrams*, 292 F.3d at 432 (citing *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.* 75 F.3d 801, 812 (2d Cir. 1996)).

executive officer and chief financial officer], [the chief executive officer and chief financial officer] had knowledge of certain delinquent account information which may appear in monthly reports."); *Nathenson*, 267 F.3d at 424 ("We recognize that normally an officer's position with a company does not suffice to create an inference of scienter.") (finding "a number of special circumstances" in addition supported scienter); *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994) (allegation that "Because of their board membership and/or their executive and managerial positions with URCARCO, defendants . . . knew or had access to information concerning the adverse non-public information about URCARCO's adverse financial outlook" insufficient to establish scienter); *In re Alamosa Holdings, Inc.*, ___ F. Supp. 2d ___, 2005 WL 712001, at *23 (N.D. Tex. 2005) ("Moreover, the Plaintiffs' general allegations that Sharbutt, Cowan, and the Roberts Brothers, because of their positions, were involved in the day-to-day operations of Alamosa and therefore must have been aware of the fraudulent accounts and 'the accounts receivable situation simply lacks the requisite specificity.'") (quoting *Goldstein*, 340 F.3d at 251, and citing *Abrams*); *Zishka v. Am. Pad & Paper Co.*, 2001 WL 1645500, at *5 (N.D. Tex. 2001), *aff'd* 72 Fed. Appx. 130 (5th Cir. 2003) (per curiam, unpub.) ("Thus, the Court refuses to read *Nathenson* as requiring the Court to presume that Hanson and Gard had knowledge of fraud simply because of their

position as company insiders.").[6]  Accordingly, the Individual Defendants' positions are insufficient to establish scienter.

Lead Plaintiffs also argue that the Individual Defendants' scienter is shown by their stock sales.  *See Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 368 (5th Cir. 2004) ("'insider trading is suspicious only when dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information*'") (emphasis added, quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999)).  These stock sales ended by December 2003, however, and the 2003 10-K was not filed until March 11, 2004.  *See* Complaint ¶ 4.  Stock sales *before* an alleged misrepresentation do not fit the paradigm of selling *after* a misrepresentation inflated the stock price to maximize personal benefit from undisclosed inside information, and thus do not support a strong inference of scienter.  The Complaint thus fails to establish scienter with respect to the 2003 10-K alleged misrepresentation of compliance  with Medicare and Medicaid requirements.  Accordingly, the Court dismisses that claim as to the Individual Defendants.

That claim with respect to Odyssey has the same failing.

For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to

---

[6]Though not precedential under the Fifth Circuit's Local Rule 47.5.4, the opinion affirming *Zishka* did state: "The plaintiffs' other allegations, for the most part, amount to nothing more than the unsupported assumption that because of their positions in the company, the defendants had knowledge that the company's statements were false or misleading. The defendants' positions within the company are not sufficient to presume knowledge of the company's difficulties and manipulation of the LIFO reserve." 72 Fed. Appx. at 132.

> look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

*Southland*, 365 F.3d at 365 (citations and footnote omitted). The Complaint does not allege scienter on behalf of Odyssey through an corporate official or officials other than the Individual Defendants. Because the Complaint fails adequately to allege scienter for the Individual Defendants, it follows that it also fails adequately to allege scienter for Odyssey. Therefore, the Court dismisses the claim for misrepresentation in the 2003 10-K regarding Medicare and Medicaid compliance with respect to Odyssey.

### B. Omissions Regarding Medicare and Medicaid Are Not Pled with Particularity

Finally, the Court considers the repeated allegations in the Complaint regarding the misleading omission of not disclosing the Medicare and Medicaid issues. *See* Complaint ¶¶ 49, 58, 62, 67, 75, 78, 87, 90 & 96. As discussed above, the Complaint recites lengthy statements of Odyssey and then alleges those statements were false, apparently because they omitted to disclose other information. Although the Complaint labels these as misrepresentations, the substance of the charge is that otherwise truthful statements were misleading because they omitted disclosure of the Medicare and Medicaid (and other) issues. This is a traditional claim for fraudulent omission.

Rule 10b-5 claims encompass fraudulent omissions. *See, e.g.*, *Dura*, 125 S. Ct. at 1631 (elements of Rule 10b-5 claim includes "*a material misrepresentation (or omission)*")

(emphasis in original; citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  In relevant part, Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> &ast; &ast; &ast;
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The particularity requirements of the PSLRA apply with equal force to omissions.  *See* 15 U.S.C. § 78u-4(b)(1)(B) (applies to private action where plaintiff alleges defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading").  Likewise, Rule 9(b) is not limited to affirmative misrepresentations and includes fraud by omission.  In explaining the requirements of the PSLRA and Rule 9(b), Courts have tended to lump omissions together with misrepresentations:

> To summarize, a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
>
> (1) specify the each [*sic*] statement alleged to have been misleading, i.e., contended to be fraudulent;
>
> (2) identify the speaker;
>
> (3) state when and where the statement was made;
>
> (4) plead with particularity the contents of the false representations;
>
> (5) plead with particularity what the person making the misrepresentation obtained thereby; and
>
> (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

> This is the "who, what, when, where, and how" required under Rule 9(b) in
> our securities fraud jurisprudence and under the PSLRA.

*ABC Arbitrage*, 291 F.3d at 350.    This litany does not fit omissions as well as

misrepresentations.  *Cf. In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 589

(D.N.J. 2001) ("The Court recognizes that it is difficult to state an omission with

particularity, as required by the PSLRA.").

Few reported opinions have addressed how to apply the particularity requirement to

omissions.  In *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370 (5th

Cir. 2004), the Fifth Circuit declined to address a Rule 9(b) claim as an alternate ground for

affirmance, leaving that for the district court to address in the first instance on remand.  The

Court offered the following guidance:

> We remind the district court, however, of the central importance of rule
> 9(b) in regard to allegations of fraud:
> . . .
> In cases concerning fraudulent misrepresentation and omissions
> of facts, Rule 9(b) typically requires the claimant to plead the
> type of facts omitted, the place in which the omissions should
> have appeared, and the way in which the omitted facts made the
> representations misleading.

*Id.* at 381 (quoting JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 9.03[1][b], at 9-18

through 9-19 (3d ed. 2003)(footnotes omitted)).

In *Hernandez v. CIBA-Geigy Corp. USA*, 200 F.R.D. 285 (S.D. Tex. 2001), the court

considered the Rule 9(b) requirement in the context of a claim of common law fraud by

nondisclosure.  The court there noted that "the Plaintiffs fail to allege the circumstances that

would necessitate making such disclosures, such as when and where these disclosures should

ORDER – PAGE 20

have been made.  Therefore, the Plaintiffs fail to re-plead the omission element of common law fraud with particularity as required by Rule 9(b)."  *Id.* at 291.

"What constitutes 'particularity' will necessarily differ with the facts of each case and hence the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).  The Court here will not rush in where the Circuit declines to tread, and does not purport to set out requirements for omissions generally.  Rather, the Court will attempt to articulate what it understands Lead Plaintiffs must allege, given Lead Plaintiffs' theory of the case and the requirements of Rule 9(b), the PSLRA, and applicable case law.

The Court understands Lead Plaintiffs' theory with respect to the omissions to be: otherwise truthful statements were misleading *because the statement suggests an unstated, false inference or implication contrary to the omitted facts.  Cf. Union Pac. Resources Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (finding "partial disclosures that *conveyed a false impression*" actionable; emphasis added).  In order to comply with the PSLRA's instruction to "specify each statement alleged to have been misleading," 15 U.S.C. § 78u-4(b)(1), and comply with Rule 9(b)'s particularity requirement, it would appear, first, that Lead Plaintiffs should specify the statement that is misleading due to the omission in the same manner as a misrepresentation, i.e., the who, what, when, and where.

Compliance with the PSLRA'a instruction to "specify . . . the reason or reasons why the statement is misleading," *id.*, can become more complex.  In some circumstances, the

subject matter of the misleading statement and the omitted facts are closely enough related that the "why" is apparent simply from identifying the misleading statement and the omitted facts. In other circumstances, as here, where the subject matter of the allegedly misleading statement is unrelated to the subject matter of the omitted facts, greater specificity is required to explain why the statement is misleading.

For example, in *Plotkin v. IPaxess, Inc.*, 407 F.3d 690 (5th Cir. 2005), the Fifth Circuit found an omission was adequately pled. The misleading statement in a May 25 press release was that IPaxess had entered into a major new contract for sales to AGPI and Lynxus. *Id.* at 693-94. The omitted facts were that AGPI and Lynxus were related companies, that AGPI was new, that Lynxus was very small, and that both companies were in poor financial health, as shown by events occurring immediately after the announcement. *Id.* at 697-98. The Court held that "[a] fair reading of the May 25 press releases would reasonably induce investors to believe that IPaxess had a legitimate expectation of revenues from the agreements it had just struck with AGPI and Lynxus;" that "[a] reasonable investor reading the releases would also have formed the impression that AGPI and Lynxus were significant international companies which could serve as credible business partners to IPaxess;" and that "IPaxess's announcement of these agreements properly raised the inference that IPaxess expected its partners to perform under the agreement." *Id.* at 697. The relationship between the misleading announcement and the omitted facts was apparent, and the pleading was sufficiently particular without further explanation why the statements were misleading due to the omissions.

In contrast, in *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004), the Fifth Circuit found the relationship between the allegedly misleading statement in a press release and the omitted facts insufficiently clear and not addressed with particularity in the pleadings. The misleading statement was a press release announcing a substantial new contract. *Id.* at 374. The omitted facts were that the defendant was required to obtain a performance bond and that the contract was segregated into three phases. *Id.* The Fifth Circuit held that "[t]he allegations concerning failure to mention the surety bond and contract phasing provisions are also deficient in that the factual allegations of the Complaint do not reflect, and it does not otherwise appear, that the omission of these details from the press release rendered it misleading." *Id.* at 375 n. 15. Thus if the misleading nature of the statement is not apparent from the content of the statement and the substance of the omissions, the factual allegations of the complaint must set forth an explanation of why the omission rendered the statement misleading.

Here there is no apparent relation between the allegedly misleading statements and the omitted information. *Compare* Complaint ¶ 44 (announcement of 1QFY03 results and projected 2003 revenue growth), ¶ 50 (acquisitions of other hospice care centers), ¶ 53 (2QFY03 results), ¶ 59 (acquisition of other hospice care centers), ¶ 63 (3QFY03 results), ¶ 68 (acquisition of other hospice care centers), ¶ 71 (1QFY04 results), ¶ 76 (FY04 revenue estimates), ¶ 82 (1QFY04 results), ¶ 88 (FY04 and FY05 EPS estimates), ¶ 91 (2QFY04 results) *with, e.g.*, Complaint ¶ 49 ("defendants" knew of Medicare and Medicaid irregularities).

Because there is no apparent relationship between the subject matter of the allegedly misleading statements and the omitted information, the Complaint must establish with particularity the "reasons why the statement is misleading" in its allegations. The Complaint should specify the inference or implication that allegedly arises from the statement and explain *why* that inference or implication arises from the statement. Finally, the Complaint should specify the omitted information that is contrary to the implication or inference arising from the allegedly misleading statements, and establish that the omitted information was known to the speaker.[7] The Complaint does not accomplish this.

The Complaint is deficient in at least two respects. First, it does not even make any attempt to satisfy the PSLRA's command to specify *why* the statements were misleading. It simply asserts that the statements were misleading and asserts what the omitted information was, without drawing any kind of connection between the two. Second, it does not appear that there *is* any relation between the statements alleged to be misleading and the omitted information. The allegedly misleading statements are in the nature of projections of revenue growth, *e.g.*, Complaint ¶ 44, which has no direct relationship to regulatory compliance and gives rise to no inference or implication of regulatory compliance.

Although the Complaint does not articulate any connection, the logic behind it appears to be that the issue of Medicare and Medicaid compliance is so severe and so pervasive that *any* statement regarding Odyssey that does not disclose that issue is misleading. From this

---

[7]*Cf. Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 374 (5th Cir. 2004) (criticizing complaint alleging improper omission of contractual provisions because "[w]hich, if any, of the individual defendants knew of those provisions is not alleged.").

ORDER – PAGE 24

perspective, an Odyssey officer who said "Good morning" during the class period would have committed a Rule 10b-5 violation. This view would require a defendant to choose between an affirmative duty to disclose everything if *anything* is said and a vow of silence. The securities laws do not require such an election. Absent such a broad view of the duty to disclose, it does not appear that the failure to disclose the issue of Medicare and Medicaid compliance rendered the otherwise truthful statements misleading. There simply is too attenuated a relationship between the two subjects, and the Complaint makes no attempt to bridge this analytical gap. Accordingly, the claims in the Complaint alleging statements were misleading for failure to disclose the issue of Medicare and Medicaid compliance are dismissed for failure to plead with particularity why the statements were misleading.

## CONCLUSION

Most of the alleged misrepresentations in the Complaint are dismissed because it fails to allege that they caused any loss. Those representations that are alleged to have caused loss are not actionable because of the safe harbor (earnings per share estimate), they relate to immaterial puffing (operations are good); they fail to allege scienter adequately (affirmative misrepresentations regarding regulatory compliance), or they fail to plead with particularity why statements were misleading (omissions regarding regulatory compliance). Accordingly, the Court dismisses the Complaints' section 10(b) claim for failure to state a claim upon which relief can be granted. As a consequence, the Complaint's section 20(a) claim likewise fails and the Court likewise dismisses the section 20(a) claim.

Lead Plaintiffs make a token request for leave to amend at the end of their response. It appears that the deficiencies the Court has noted largely are a consequence of the facts, rather than any lack of effort on the part of Lead Plaintiffs. The Court is thus skeptical that leave to amend would be of any use. Moreover, denial of leave to amend would not appear to be an abuse of discretion. *See, e.g.*, *Southland*, 365 F.3d at 384-85; *Goldstein*, 340 F.3d at 254-55. However, because the Supreme Court's *Dura* opinion was not available when the Complaint was drafted, and because there has been little guidance on how the particularity requirements of the PSLRA and Rule 9(b) apply to omissions, the better course here is to grant Lead Plaintiffs thirty (30) days in which they may amend and attempt to cure these deficiencies, if they choose to do so, or else decline to amend and seek further guidance from a higher court. In the event Lead Plaintiffs elect to amend, the Court notes that it has observed the twin iniquities of puzzle pleading and group pleading in the Complaint, though it has not been necessary to reach those issues to rule on the motion to dismiss; the Court is confident that any such defects will be cured if Lead Plaintiffs file an amended complaint.[8]

Signed September 29, 2005.

David C. Godbey
United States District Judge

---

[8]Lead Plaintiffs moved to strike certain exhibits in the appendix to Defendants' motion to dismiss. Because none of those exhibits was material to the Court's disposition of the motion to dismiss, the motion to strike is denied as moot.